**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ABU SADUT TANVIR AHMED,<br><br>        Plaintiff,<br><br>vs.<br><br>EQUIFAX INFORMATION SERVICES, LLC; EXPERIAN INFORMATION SOLUTIONS, INC.; TRANS UNION, LLC; and CITIBANK, N.A.,<br><br>        Defendants. | Civil Case No.: 1:26-cv-02050<br><br><br>**COMPLAINT AND DEMAND**<br>**FOR JURY TRIAL** |

Abu Sadut Tanvir Ahmed ("Plaintiff" or "Mr. Ahmed") brings this action on an individual basis, against Equifax Information Services, LLC ("Equifax"), Experian Information Solutions, Inc. ("Experian"), Trans Union, LLC ("Trans Union") (collectively the "Credit Bureau Defendants"), and Citibank, N.A. ("CBNA") (all Defendants collectively, "Defendants") and states as follows:

## **INTRODUCTION**

1. Plaintiff, an identity theft victim, brings this action against Defendants for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et. seq.*

2. More than twenty million people, just under 10% of all adult Americans, are victims of identity theft each year.[1] Federal Law requires that each consumer reporting agency ("CRA") protect victims by taking steps to remove fraudulent information from victims' reports, to ensure that only third parties with permissible purposes see victims' reports and to implement fraud alerts

---

[1] Victims of Identity Theft, 2018, 1. U.S. Dept. of Justice, Bureau of Justice Statistics. April 2021, NCJ 256085.

and security freezes at victims' requests. This lawsuit arises from Defendant's refusal to comply with these statutory requirements and resulting failure to protect Plaintiff from identity theft and identity theft consequences.

3.    The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service, or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

4.    However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Credit Bureau Defendants acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

5.    The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

6.    These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a

2

car or mortgage loan.

7.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq. ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

8.      One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

9.      The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

10.     The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

11.     The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the

disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

12.     In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." See 15 U. S.C. § 1681(a)(4).

13.     The FCRA also requires Furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

14.     Plaintiff's claims arise out of the Defendants plainly deficient reinvestigations considering Plaintiff's multiple disputes and repeated notice that he was a victim of identity theft.

15.     Specifically, in or around early 2024, Plaintiff began receiving mail at his address which indicated that credit and debit cards were being issued in his name. Plaintiff also received notices that his credit card limits were being increased without him requesting an increase.

16.     Worried about what was going on, Plaintiff reviewed his credit reports and bank statements and noticed that several credit accounts that he did not recognize were reporting in his credit reports and that his credit cards had been fraudulently used in several transactions without his knowledge, consent, or authorization, and with no benefit to him.

4

17.     By January 2025, Plaintiff had uncovered that more than 30 credit accounts had been fraudulently opened in his name. He also discovered that several of his legitimate bank accounts had been compromised, with funds unlawfully withdrawn and used to pay balances on unauthorized credit cards. Taking immediate action, Plaintiff personally disputed each fraudulent account and the related hard inquiries.

18.     Plaintiff acted with haste and urgency to remove and shut down the fraudulent accounts and transactions from further wreaking havoc on his financial wellbeing and credit standing, including by having them removed from his credit reports.

19.      In nearly all cases, the relevant creditors acknowledged the identity theft, removed the accounts, and deleted the inquiries from his credit report. However, Defendant CBNA was the sole institution that refused to cooperate.

20.     Indeed, although Defendant CBNA or its agent had initially issued a letter acknowledging the disputed transactions as fraudulent, it later reversed that determination without a genuine or valid explanation.

21.     Before the identity theft, Plaintiff's credit profile reflected only positive credit accounts, and no delinquencies.

22.     Plaintiff filed a police report with the 105th Precinct of the New York City Police Department on July 26, 2024, and an FTC Affidavit on May 9, 2025.

23.     Plaintiff provided Defendant CBNA with notice of the identity theft and provided a copy of the Police Report, and Identity Theft Affidavit with the FTC, and immediately alerted Defendant CBNA of the unauthorized transactions.

24.     Nonetheless, Defendant CBNA has continued to attempt to collect the money from Plaintiff, flatly rejecting Plaintiff's claims of identity theft and stating that Plaintiff was responsible

5

for the unauthorized transactions.

25. To date, Defendant CBNA has refused to conduct a reasonable investigation of Plaintiff's claim of identity theft and that the charges made between April 24, 2024 and July 3, 2024 were fraudulent, and has instead continued to attempt to collect the balance of approximately $22,000 that was incurred as a result of identity theft and the CBNA fees and interest attached thereto on account thereof.

26. Additionally, Defendant CBNA has reported the fraudulent charges amounting to approximately $22,000.00 to the Credit Bureau Defendants despite being aware that the fraudulent charges were not made by Plaintiff, but were the result of theft of Plaintiff's identity, in violation of the Fair Credit Reporting Act ("FCRA").

27. Plaintiff has sent identity theft notifications, which include a police report and the FTC Identity Theft Affidavit to establish that he did not make the fraudulent purchases or otherwise authorize anyone to make those purchases to all of the Defendants.

28. Despite receiving notice that the CBNA Best Buy Account charges of approximately $22,000.00 incurred between April 24, 2024 and July 3, 2024 inclusive of the CBNA fees and interest attached thereto on account thereof, and being reported to Plaintiff's Equifax credit file and/or report was the product of identity theft, Defendant Equifax has failed to suppress or remove or block the identity theft information from Plaintiff's credit file and/or reports, in violation of the FCRA, 15 U.S.C. § 1681 *et. seq.*

29. Despite receiving notice that the CBNA Best Buy Account charges of approximately $22,000.00 incurred between April 24, 2024 and July 3, 2024 inclusive of the CBNA fees and interest attached thereto on account thereof, and being reported to Plaintiff's Experian credit file and/or report was the product of identity theft, Defendant Experian has failed

to suppress or remove or block the identity theft information from Plaintiff's credit file and/or reports, in violation of the FCRA, 15 U.S.C. § 1681 *et. seq.*

30.    Despite receiving notice that the CBNA Best Buy Account charges of approximately $22,000.00 incurred between April 24, 2024 and July 3, 2024 inclusive of the CBNA fees and interest attached thereto on account thereof, and being reported to Plaintiff's Trans Union credit file and/or report was the product of identity theft, Defendant Trans Union has failed to suppress or remove or block the identity theft information from Plaintiff's credit file and/or reports, in violation of the FCRA, 15 U.S.C. § 1681 *et. seq.*

31.    Additionally, despite, and upon information and belief, receiving at least one automated credit dispute verification ("ACDV") from Defendant Equifax, Defendant CBNA has failed to properly reinvestigate Plaintiff's dispute, and amend its reporting accordingly.

32.    Additionally, despite, and upon information and belief, receiving at least one automated credit dispute verification ("ACDV") from Defendant Experian, Defendant CBNA has failed to properly reinvestigate Plaintiff's dispute, and amend its reporting accordingly.

33.    Additionally, despite, and upon information and belief, receiving at least one automated credit dispute verification ("ACDV") from Defendant Trans Union, Defendant CBNA has failed to properly reinvestigate Plaintiff's dispute, and amend its reporting accordingly.

34.    Accordingly, Plaintiff brings claims against the Credit Bureau Defendants for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), for failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and in fact, the product of identity theft, and for failing to delete the disputed information from Plaintiffs credit file, in violation of the FCRA, 15 U.S.C. § 1681i, for failing to block the identity theft items as

7

disputed and supported by Plaintiff in violation of the FCRA, 15 U.S.C. § 1681c-2.

35. Further, Plaintiff also brings claims against the Furnishers, Defendant CBNA, for failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and in fact, the product of identity theft, and for failing to delete the disputed information from Plaintiff's credit file, in violation of FCRA, 15 U.S.C. § 1681s-2b.

36. As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs, and attorneys' fees from the Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq., as described herein.

## JURISDICTION AND VENUE

37. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 because Plaintiff alleges violations of the FCRA, a federal law. See 15 U.S.C. § 1681p (FCRA) (permitting actions to enforce liability in an appropriate United States District Court).

38. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Defendants regularly transacts business within this District, are otherwise subject to personal jurisdiction in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## PARTIES

39. Abu Sadut Tanvir Ahmed ("Plaintiff" or "Mr. Ahmed") is a natural person residing in Queens, New York, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

40. Defendant Equifax Information Services, LLC ("Equifax") is a limited liability company with a principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309, and is authorized to do business in the State of New York, including within this District.

41. Defendant Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f) and is a "person" as defined by 15 U.S.C. § 1681a(b). Defendant Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

42. The information that Defendant Equifax collects, maintains, and sells includes confidential details about the income, finances, credit histories, address histories, application histories, credit review histories, and employment histories of 245 million Americans. Defendant Equifax also collects consumers' personal identifiers, such as Social Security Numbers ("SSNs"), dates of birth, telephone numbers, and addresses.

43. Defendant Equifax collects and maintains such information about consumers, whether consumers like it or not. Consumers do not have a choice as to whether Defendant Equifax collects and maintains information about them. Not only that, but consumers cannot remove information that Defendant Equifax collects and maintains about them from the Equifax database. Further, Defendant Equifax sells that information about consumers for its unilateral profit, none of which is shared with the Plaintiff, who is the subject of the very data that Defendant Equifax sold.

44. Defendant Experian Information Solutions, Inc. ("Experian") is a corporation with a principal place of business located at 475 Anton Boulevard, Costa Mesa, California 92626, and is authorized to do business in the State of New York, including within this District.

45. Defendant Experian is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f) and is a "person" as defined by 15 U.S.C. § 1681a(b). Defendant Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning

9

consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

46.    The information that Defendant Experian collects, maintains, and sells includes confidential details about the income, finances, credit histories, address histories, application histories, credit review histories, and employment histories of 245 million Americans. Defendant Experian also collects consumers' personal identifiers, such as Social Security Numbers ("SSNs"), dates of birth, telephone numbers, and addresses.

47.    Defendant Experian collects and maintains such information about consumers, whether consumers like it or not. Consumers do not have a choice as to whether Defendant Experian collects and maintains information about them. Not only that, but consumers cannot remove information that Defendant Experian collects and maintains about them from the Experian database. Further, Defendant Experian sells that information about consumers for its unilateral profit, none of which is shared with the Plaintiff, who is the subject of the very data that Defendant Experian sold.

48.    Defendant Trans Union, LLC ("Trans Union") is a corporation with a principal place of business located at 555 West Adams Street, Chicago, Illinois 60661, and is authorized to do business in the State of New York, including within this District.

49.    Defendant Trans Union is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f) and is a "person" as defined by 15 U.S.C. § 1681a(b). Defendant Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

50.    The information that Defendant Trans Union collects, maintains, and sells includes

confidential details about the income, finances, credit histories, address histories, application histories, credit review histories, and employment histories of 245 million Americans. Defendant Trans Union also collects consumers' personal identifiers, such as Social Security Numbers ("SSNs"), dates of birth, telephone numbers, and addresses.

51.    Defendant Trans Union collects and maintains such information about consumers, whether consumers like it or not. Consumers do not have a choice as to whether Defendant Trans Union collects and maintains information about them. Not only that, but consumers cannot remove information that Defendant Trans Union collects and maintains about them from the Trans Union database. Further, Defendant Trans Union sells that information about consumers for its unilateral profit, none of which is shared with the Plaintiff, who is the subject of the very data that Defendant Trans Union sold.

52.    Defendant Citibank, N.A. ("CBNA") is a limited liability company with a principal place of business located at 5800 South Corporate Place, Sioux Falls, South Dakota 57108, and is authorized to do business in the State of New York, including within this District.

53.    Defendant CBNA is a "Furnisher" as defined in 12 CFR 1022.41 and is a "person" as defined by 15 U.S.C. § 1681a(b). Defendant CBNA regularly furnishes information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report. A data furnisher, such as Defendant CBNA, is an entity that reports information about consumers to consumer reporting agencies (CRAs), which may include credit bureaus, tenant screening companies, check verification services, and medical information services, etc. Like CRAs and data users, data furnishers have legal obligations and rules that must be upheld & followed pursuant to 15 U.S.C. § 1681s-2b of the FCRA.

## SUMMARY OF THE FAIR CREDIT REPORTING ACT

54.     The FCRA governs the conduct of consumer reporting agencies to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

55.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. See 15 U.S.C. § 1681(a).

56.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. See 15 U.S.C. § 1681(b).

57.     Congress also recognized that CRAs such as the Credit Bureau Defendants "have assumed a vital role in assembling and evaluating consumer credit and other information on consumers." 15 U.S.C. § 1681(a)(3). Therefore, Congress determined that there "is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681(a)(4).

58.     For that reason, Congress ensured that the FCRA also provides special protections for victims of identity theft.

59.     The first form of protection is the "block." When a consumer identifies any information in their credit file that is the product of identity theft, the CRA must block (delete) the

12

reporting of that information within four business days, provided the consumer submits:

        a)        Appropriate proof of the identity of the consumer;

        b)        A copy of an identity theft report;

        c)        The identification of such information by the consumer; and,

        d)        A statement by the consumer that the information is not information relating to any transaction by the consumer.

15 U.S.C. § 1681c-2(a).15 U.S.C. § 1681c-2(a).

60. The second form of protection the FCRA provides for identity theft victims is the "fraud alert."

61. Specifically, upon request of the consumer, a CRA must place an "initial fraud alert" in the file of that consumer, and provide that alert along with any credit score generated in using that file, for one year beginning on the date of the request. Unless one year has passed, the CRA can only remove the alert if the consumer requests removal and the CRA receives "appropriate proof of the identity of the requester." 15 U.S.C. § 1681c-1(a)(1).

62. The third form of protection the FCRA provides for identity theft victims is a "security freeze," which a consumer can request from nationwide CRAs such as the Defendants here.

63. A security freeze prohibits a CRA from disclosing the contents of a consumer report that is subject to the freeze to any person requesting the consumer report.[2] 15 U.S.C. § 1681c-1(i)(1). Stated otherwise, if a consumer's report is frozen, a CRA will not be able to sell it to creditors assessing credit applications from identity thieves using an affected consumer's identity.

---

[2] Certain statutorily exempt entities can still request and receive a frozen report. See 15 U.S.C. § 1681c-1(i)(4). But those exemptions do not apply to the matter at hand.

64.    Once placed, a security freeze does not expire. A CRA can remove a security freeze only at "the direct request of the consumer," or if it finds that the freeze "was placed due to a material misrepresentation of fact by the consumer." 15 U.S.C. § 1681c-1(i)(3)(A). Furthermore, when a consumer requests removal, the CRA must first obtain "proper identification" from the consumer before removing the freeze." 15 U.S.C. § 1681c-1(i)(3)(C).

65.    The fourth and final form of protection the FCRA provides for identity theft victims is that even in the absence of a security freeze, a CRA may only release a consumer report to a person "which it has reason to believe...intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished..." 15 U.S.C. § 1681b(a). When a credit transaction is not initiated by the consumer, a CRA may only release the consumer's report with the consumer's authorization or if the user is making a firm offer of credit. 15 U.S.C. § 1681b(c). No consumer reporting agency may furnish a consumer report to any person if it has reasonable grounds for believing that the consumer report will not be used for a permissible purpose. 15 U.S.C. § 1681e(a).

66.    To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

67.    Similarly, the FCRA also imposes a duty upon the Furnishers, such as Defendant CBNA, to reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies. (15 U.S.C. § 1681s-2b).

68.    The FCRA provides consumers with a private right of action against consumer

14

reporting agencies, such as the Credit Bureau Defendants, and data furnishers such as Defendant CBNA, that willfully or negligently fail to comply with their statutory obligations under the FCRA.

## FACTUAL ALLEGATIONS

**A.    Identity Theft Incident and Plaintiff's Direct Dispute to Defendant CBNA May 2024**

69.    In or around November 24, 2023, Plaintiff opened a CBNA Best Buy Credit Card for the purchase of an iPhone totaling $863.55. The device was financed under a Citibank/Best Buy account ending in 6890.

70.    Plaintiff made timely payments toward this balance, $400 on December 11, 2023, followed by $476.11 on January 5, 2024, which resulted in the full and complete payoff of the iPhone purchase.

71.    Subsequently, on or about February 17, 2024, Plaintiff used the same credit card to purchase a laptop for $760.36, during which time he enrolled in a monthly auto-payment plan of $65 per month to be debited from his Chase checking account. Payments were successfully debited on March 29, April 29, and May 30, 2024, totaling $195.36.

72.    Sometime in May 2024, Plaintiff received a call from Best Buy referencing increased payment activity and suspicious charges. Plaintiff immediately informed Best Buy that he did not recognize the new transactions. Best Buy's fraud department advised him to stop the auto payments and file a police report.

73.    Plaintiff complied, and he filed a police report on July 26, 2024.

74.    In late June 2024, while Best Buy's fraud investigation remained ongoing, Plaintiff noticed two large and unfamiliar online payments posted to the Best Buy/CBNA account ending in 6890.

75.    Specifically, one transaction was for $5,034.30 and another was for $3,100.17, and

15

both were dated June 28, 2024.

76. Plaintiff did not recognize or authorize these transactions, nor were the funds drawn from any of his personal bank accounts.

77. Plaintiff did not provide anyone with consent or permission to make those transactions or to use his CBNA Best Buy Credit Card to make any transactions.

78. Shortly afterward, Plaintiff received notices from Best Buy confirming that both payment attempts had been returned unpaid because the bank was unable to process them.

79. On or about October 17, 2024, Plaintiff received a letter from Citibank/Best Buy stating that its investigation had confirmed the presence of unauthorized transactions on the account, and that the disputed charges were acknowledged as fraudulent.

80. However, just two months later, in or around December 2024, CBNA unexpectedly reversed its position and held the Plaintiff fully responsible for the balance, without providing any clear explanation for the change in determination.

81. Subsequently, on or about January 5, 2025, the CBNA account was placed with ARS National Services for collection, indicating that Citibank/Best Buy had transferred or sold the disputed debt to a third-party collection agency despite the pending fraud dispute.

82. On or about March 8, 2025, as Plaintiff's efforts continued with repeated phone calls challenging the purported debt, Plaintiff also notified ARS National Services that the account was subject to an active fraud dispute and should not be pursued for collection.

83. On or about April 8, 2025, ARS issued a written response to Plaintiff confirming that the account was being returned to Citibank/Best Buy for further handling.

**B.    Defendant CBNA's Unreasonable Dispute Investigation March 2025**

84. On or about March 31, 2025, Plaintiff called CBNA/Best Buy's Security

Operations team to clarify the basis of their denial of his fraud claim.

85.    During the call, the CBNA representative informed Plaintiff that the disputed transactions were not considered fraudulent based on the following bank's internal findings: 1) the geographic proximity of the transactions to Plaintiff's address, and 2) the fact that the card had not been formally reported as lost or stolen, which was interpreted as an indication of account ownership and control.

86.    Following this discussion, Plaintiff informed CBNA that, on the specific dates when the disputed transactions occurred, he was scheduled for work and present at his hospital job in Long Island, New York. Plaintiff practices there as an Endoscopy Technician. Plaintiff further explained that, aside from sharing his hospital attendance spreadsheet, he had no other way to document his physical location during those times.

87.    Plaintiff was utterly confused and dismayed at Defendant CBNA's response and clearly sham investigation.

88.    On information and belief, the only investigation Defendant CBNA conducted was into whether Plaintiff had opened the CBNA Best Buy Credit Card Account.

89.    On information and belief, Defendant CBNA did not conduct any investigation as to whether the April 24, 2024, through July 3, 2024, charges were fraudulent.

90.    Defendant CBNA failed to produce any evidence on which it reasonably relied in support of its decision to deny Plaintiff's dispute.

91.    On or about May 9, 2025, Plaintiff contacted CBNA to verify whether the account had indeed been returned from its debt collector ARS.

92.    During the call, a CBNA representative confirmed that the account was now back under CBNA's control.

17

93.     During the call, Plaintiff additionally inquired about making a good-faith payment toward the legitimate balance related to the original laptop purchase (totaling $565.36). However, he was informed that unless the full balance of $22,390, including the disputed fraudulent charges, was paid, any partial payment might be considered void.

94.     On or about May 12, 2025, despite CBNA's warning, Plaintiff proceeded to make a payment in the amount of $565.36 directly to Citibank.

95.     Plaintiff's payment on May 12, 2025, constituted the complete payment of the entire legitimate balance owed by Plaintiff on the CBNA Best Buy Credit Card.

96.     On or about May 9, 2025, Plaintiff filed an FTC Identity Theft Affidavit.

**C.     Plaintiff's First Dispute to the Credit Bureau Defendants**

97.     Realizing that Defendant CBNA would continue to report inaccurately that Plaintiff was responsible for the approximately $22,000.00 balance to the Credit Bureau Defendants, Plaintiff determined that he needed to escalate the issue to prevent further damage to his credit files and reports.

98.     On or about May 21, 2025, Plaintiff disputed the charges on the CBNA Best Buy Credit Card Account with the Credit Bureau Defendants.

99.     Plaintiff provided sufficient information to identify his credit file and sufficient information to support his dispute.

100.    In his dispute, Plaintiff identified each of the fraudulent transactions, late fees, and interest, and explained that he had been the victim of identity theft.

101.    Along with his dispute, Plaintiff enclosed a copy of his driver's license, social security card, FTC identity Theft Report, and police report, along with other supporting documents.

102.    Plaintiff requested that the identity theft information be blocked from his credit file.

**D.    Defendant Equifax's Unreasonable Dispute Reinvestigation**

103.    On or about May 27, 2025, Defendant Equifax received Plaintiff's dispute and request that the identity theft information be blocked from his credit file.

104.    Upon information and belief, Defendant Equifax sent Defendant CBNA an automated credit dispute verification ("ACDV") pursuant to Plaintiff's May 21, 2025, dispute to Defendant Equifax.

105.    On June 1, 2025, Defendant Equifax issued correspondence to Plaintiff wherein it expressed that the disputed information would not be blocked, but that the creditor would be contacted to verify the information.

106.    Equifax's correspondence further stated that in order to block the fraudulent information, it would require proof of identity, a list of the specific fraudulent items, and a complete FTC or police report, all of which had already been provided with Plaintiff's dispute.

107.    Upon information and belief, Defendant CBNA received Defendant Equifax's ACDV and did not adequately reinvestigate Plaintiff's dispute.

108.    On June 1, 2025, Defendant Equifax issued dispute results to Plaintiff wherein it communicated that the disputed information would not be blocked or removed because Defendant CBNA had verified the disputed information as accurate.

109.    Defendant Equifax failed to adequately review all of the information provided to it by Plaintiff.

110.    Defendant Equifax failed to reinvestigate Plaintiff's May 2025 dispute and failed to block the identity theft information.

111.    Defendant Equifax violated 15 U.S.C. § 1681i by failing to conduct a reasonable

investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to recognize that the disputed charges were the product of identity theft.

**E.    Defendant Experian's Unreasonable Dispute Reinvestigation**

112.    On or about May 27, 2025, Defendant Experian received Plaintiff's dispute and request that identity theft information be blocked from his credit file.

113.    On or about June 2, 2025, Defendant Experian issued a letter to Plaintiff in response to Plaintiff's dispute.

114.    In that letter, Defendant Experian acknowledged receipt of Plaintiff's request that information be blocked due to identity theft.

115.    On or about June 20, 2025, Defendant Experian issued a letter to Plaintiff in response to Plaintiff's dispute, in which Defendant Experian's investigation results included the same delinquent account multiple times, with a balance slightly reduced to $21,825. Additionally, Defendant Experian added a new status indicating that the card had been lost or stolen—an inaccurate and false classification.

116.    Upon information and belief, Defendant Experian sent Defendant CBNA an automated credit dispute verification ("ACDV") pursuant to Plaintiff's May 2025 dispute to Defendant Experian.

117.    Upon information and belief, Defendant CBNA received Defendant Experian's ACDV and did not adequately reinvestigate Plaintiff's dispute.

118.    In effect, Defendant Experian's dispute results to Plaintiff refused to block the disputed information because Defendant CBNA had certified to Defendant Experian that the information was accurate.

119.    Defendant Experian failed to adequately review all of the information provided to

it by Plaintiff.

120.    Defendant Experian failed to reinvestigate Plaintiff's May 2025 dispute and failed to block the identity theft information.

121.    Defendant Experian violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to recognize that the disputed charges were the product of identity theft.

**F.    Defendant Trans Union's Unreasonable Dispute Reinvestigation**

122.    On or about May 24, 2025, Defendant Trans Union received Plaintiff's dispute and request that identity theft information be blocked from his credit file.

123.    Defendant Trans Union failed to issue dispute results to Plaintiff.

124.    Upon information and belief, Defendant Trans Union sent Defendant CBNA an automated credit dispute verification ("ACDV") pursuant to Plaintiff's May 2025 dispute to Defendant Trans Union.

125.    Upon information and belief, Defendant CBNA received Defendant Trans Union's ACDV and did not adequately reinvestigate Plaintiff's dispute.

126.    Plaintiff obtained and reviewed a Trans Union credit report dated August 21, 2025, and discovered that Trans Union's report was reflecting, in relation to the relevant CBNA account, a balance due of $22,390, a charged-off status, and no dispute remarks or notations.

127.    Defendant Trans Union failed to adequately review all of the information provided to it by Plaintiff.

128.    Defendant Trans Union failed to reinvestigate Plaintiff's May 2025 dispute and failed to block the identity theft information.

129.    Defendant Trans Union violated 15 U.S.C. § 1681i by failing to conduct a

reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to recognize that the disputed charges were the product of identity theft.

**G.    The Credit Bureau Defendants' Method for Considering Consumer Credit Report Disputes**

130.    The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

131.    The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

132.    That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro II."

133.    It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

134.    Metro II is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

135.    Metro II codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

136.    The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

22

137.    These ACDV "fields" have various titles for the many substantive areas into which the Metro II codes can be entered.

138.    Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

139.    The data furnishers, like Defendants CBNA, then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See 15 U.S.C. § 1681s-2(b).

140.    Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

**H.    CBNA's Unreasonable Dispute Reinvestigation May 2025**

141.    Plaintiff continued to plead his case to Defendant CBNA and dispute the unauthorized charges on his CBNA Best Buy Card which took place between April 24, 2024, and July 3, 2024.

142.    Upon information and belief, Defendant CBNA failed to adequately review all of the information provided to it by Plaintiff.

143.    Upon information and belief, Defendant CBNA verified the disputed information as accurate in response to Defendant Equifax's ACDV.

144.    Upon information and belief, Defendant CBNA verified the disputed information

as accurate in response to Defendant Experian's ACDV.

145.    Upon information and belief, Defendant CBNA verified the disputed information as accurate in response to Defendant Trans Union's ACDV.

146.    Defendant CBNA violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to recognize that the disputed charges were the product of identity theft.

### I.    Plaintiff's Second Dispute to the Credit Bureau Defendants

147.    Plaintiff was frustrated at the continued inaccurate reporting.

148.    Plaintiff was damaged and harmed by the reckless and negligent conduct and sham "investigations" of Defendants.

149.    On or about January 6, 2026, Plaintiff once again disputed the charges on the CBNA Best Buy Credit Card with Defendants Equifax, Experian, and Trans Union.

150.    Plaintiff provided sufficient information to identify his credit file and sufficient information to support his dispute.

151.    In his dispute, Plaintiff identified each of the fraudulent transactions, late fees, and interest, and explained that he had been the victim of identity theft.

152.    Along with his dispute, Plaintiff enclosed a copy of his driver's license, social security card, FTC identity Theft Report, and police report, along with other supporting documents.

153.    Plaintiff requested that the identity theft information be blocked from his credit file.

### J.    Defendant Equifax's Unreasonable Dispute Reinvestigation

154.    Sometime after January 12, 2026, Defendant Equifax received Plaintiff's dispute and request that identity theft information be blocked from his credit file.

155. On January 13, 2026, Defendant Equifax issued a letter to Plaintiff stating that it could not identify him and that he needed to submit additional proof establishing his identity.

156. Defendant Equifax failed to adequately review all of the information provided to it by Plaintiff.

157. Defendant Equifax failed to reinvestigate Plaintiff's January 2026 dispute and failed to block the identity theft information.

158. Upon information and belief, as of the time of the filing of this complaint, Defendant Equifax's credit file continues to show the fraudulent charges, despite the fact that Plaintiff provided a Police Report and FTC ID Theft Affidavit.

159. Upon information and belief, as of the time of the filing of this complaint, Defendant Equifax continued to publish inaccurate credit reports to third parties that showed the fraudulent charges, despite the fact that Plaintiff provided a Police Report and FTC ID Theft Affidavit.

160. Defendant Equifax violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to recognize that the disputed charges were the product of identity theft.

**K.     Defendant Experian's Unreasonable Dispute Reinvestigation**

161. On or about January 9, 2026, Defendant Experian received Plaintiff's dispute and request that identity theft information be blocked from his credit file.

162. Defendant Experian did not respond to Plaintiff's January 2026 dispute.

163. Defendant Experian failed to adequately review all of the information provided to it by Plaintiff.

164. Defendant Experian failed to reinvestigate Plaintiff's January 2026 dispute and

failed to block the identity theft information.

165.    Upon information and belief, as of the time of the filing of this complaint, Defendant Experian's credit file continues to show the fraudulent charges, despite the fact that Plaintiff provided a Police Report and FTC ID Theft Affidavit.

166.    Upon information and belief, as of the time of the filing of this complaint, Defendant Experian continues to publish inaccurate credit reports to third parties that show the fraudulent charges, despite the fact that Plaintiff provided a Police Report and FTC ID Theft Affidavit.

167.    Defendant Experian violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to recognize that the disputed charges were the product of identity theft.

**L.    Defendant Trans Union's Unreasonable Dispute Reinvestigation**

168.    On or about January 9, 2026, Defendant Trans Union received Plaintiff's dispute and request that identity theft information be blocked from his credit file.

169.    On or about January 16, 2026, Defendant Trans Union issued a letter to Plaintiff in response to Plaintiff's dispute.

170.    In that letter, Defendant Trans Union acknowledged receipt of Plaintiff's dispute.

171.    However, Defendant Trans Union expressed that the letter did not appear to have been sent by Plaintiff.

172.    Defendant Trans Union refused to investigate the disputed information in Plaintiff's credit file.

173.    Defendant Trans Union failed to adequately review all of the information provided to it by Plaintiff.

174.    Defendant Trans Union failed to reinvestigate Plaintiff's January 2026 dispute and failed to block the identity theft information.

175.    Upon information and belief, as of the time of the filing of this complaint, Defendant Trans Union's credit file continues to show the fraudulent charges, despite the fact that Plaintiff provided a Police Report and FTC ID Theft Affidavit.

176.    Upon information and belief, as of the time of the filing of this complaint, Defendant Trans Union continues to publish inaccurate credit reports to third parties that show the fraudulent charges, despite the fact that Plaintiff provided a Police Report and FTC ID Theft Affidavit.

177.    Defendant Trans Union violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to recognize that the disputed charges were the product of identity theft.

**M.    Plaintiff's Third Dispute to Defendant Trans Union**

178.    Throughout this time-period, Plaintiff continued to receive notices and letters in the mail regarding credit card applications and line-of-credit increases that he had not requested, and that indicated that an unrelated person, a fraudster, was continuing to access his credit accounts.

179.    In particular, on or about March 13, 2026, Plaintiff received notice that a TAB Bank/Sunbit account that had been opened on February 26, 2026, was added to his credit file.

180.    Plaintiff never applied to open that account and was completely unfamiliar with it.

181.    Deeply concerned, Plaintiff proceeded to call each of the Credit Bureau Defendants to dispute and explain that the TAB Bank/Sunbit account was fraudulent and the product of identity theft and should be blocked and removed from his credit file.

27

182.    In particular, on or about March 16, 2026, Plaintiff spoke with a Trans Union representative named Leon on the phone.

183.    During the call, Plaintiff identified himself, provided the requested personal identifiers, and explained how he was the victim of identity theft, which included the TAB Bank/Sunbit account. Plaintiff further emphasized that he had disputed several times already by mail regarding the identity theft, and that he had provided evidence of the identity theft already, including an FTC affidavit filed on May 9, 2025, along with that earlier dispute.

184.    During the call, a Trans Union supervisor accessed Plaintiff's report and confirmed that he could see the TAB Bank/Sunbit account. The supervisor said that he will file the dispute within their system identifying the TAB/Sunbit account as a fraudulent account.

185.    The supervisor confirmed that Trans Union would make contact with the account furnisher to verify whether the account is fraudulent, and, if it is, it would be removed and deleted from Plaintiff's credit file and reports.

N.    **Defendant Trans Union's Unreasonable Dispute Reinvestigation**

186.    Upon information and belief, Defendant Trans Union failed to reasonably reinvestigate Plaintiff's March 2026 dispute and failed to block the identity theft information.

187.    Upon information and belief, as of the time of the filing of this complaint, Defendant Trans Union's credit file continues to show fraudulent account information, including the TAB Bank/Sunbit account.

188.    As of the time of the filing of this complaint, Defendant Trans Union continues to publish inaccurate credit reports to third parties that show the fraudulent TAB Bank/Sunbit account with a balance that consists exclusively of fraudulent charges.

189.    Upon information and belief, Defendant Trans Union violated 15 U.S.C. § 1681i

28

by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to recognize that the disputed and fraudulent TAB Bank/Sunbit account and charges on that account were the product of identity theft.

## PLAINTIFF'S DAMAGES

190. Plaintiff did exactly what he should have done upon realizing he was the victim of identity theft and that there were fraudulent charges on his CBNA Best Buy Credit Card Account.

191. Plaintiff filed a police report and FTC Identify Theft Affidavit and contacted Defendant CBNA to notify them of the fraud so that they would zero-out the fraudulent balance.

192. Plaintiff disputed with Defendants Equifax, Experian, and Trans Union, twice.

193. Plaintiff identified himself as an identity theft victim and requested an Identity Theft Block be applied to his credit file and that a Fraud Alert be added to his credit file.

194. Defendant CBNA has repeatedly denied Plaintiff's identity theft and fraudulent charges claims – at all times failing to provide Plaintiff with any of the investigation materials it has reviewed in coming to that determination.

195. The Credit Bureau Defendants have repeatedly denied Plaintiff's identity theft and fraudulent charges claims – at all times failing to provide Plaintiff with any of the investigation materials they have reviewed in coming to that determination.

196. As a direct result of Defendant CBNA's ardent refusal to remove the disputed debt and to stop furnishing the same to the Credit Bureau Defendants, Defendant CBNA has continued to saddle Plaintiff with an approximately $22,000.00 debt which was the product of fraud and identity theft.

197. Further, as a direct result of Defendant CBNA's verification of the disputed debt to

29

the Credit Bureau Defendants, Defendant CBNA has continued to saddle Plaintiff with an approximately $22,000.00 debt which was the product of fraud and identity theft.

198.    As a direct result of the Credit Bureau Defendants' ardent refusal to block the disputed information, the Credit Bureau Defendants have continued to saddle Plaintiff with an approximately $22,000.00 debt which was the product of fraud and identity theft.

199.    Due to Defendants' ardent refusal to comply with their respective obligations pursuant to the FCRA, Plaintiff was forced to obtain legal advice and counsel, for which he incurred attorney's fees.

200.    Further, and due to Defendants' inexplicable refusal to remove and/or block information that is the product of identity theft and fraud from an identity theft victim's credit file, Plaintiff expended countless hours disputing the same with the Defendants.

201.    Defendants' conduct disrupted Plaintiff's life and adversely impacted his quality of life.

202.    Defendants' conduct caused Plaintiff's credit profile and credit standing to decrease dramatically.

203.    Plaintiff recalls that his American Express line of credit had been decreased by two thirds, from $6,000 to $2,000, on account of the fraudulent information reported on his credit reports.

204.    Plaintiff has experienced significant emotional distress and stress as a result of Defendants' conduct, which Plaintiff legitimately fears has proved and continues to prove detrimental to his health, particularly his heart health, exacerbating a preexisting heart condition.

205.    Furthermore, the stress caused by Defendants' conduct has adversely impacted Plaintiff's ability to do his work.

206. In addition to impacting his work productivity and health, dealing with the consequences of Defendants' conduct has taken Plaintiff away from time he would otherwise have spent with his friends and family. It has taken a toll on Plaintiff.

207. Defendants' conduct has caused Plaintiff extreme and ongoing stress and anxiety. Plaintiff has suffered sleepless nights, frustration, worry, and ultimately felt utterly hopeless that Defendants would ever properly reinvestigate his disputes. Further, Plaintiff reasonably believes that the fraudulent inquiries have negatively impacted and depressed his credit score. Plaintiff fears Defendants' conduct has caused irreparable damage to his credit score.

208. On or about August 3, 2025, Plaintiff applied for a pre-approved Capital One account. The pre-approved credit card offer extended to him carried an anomalous interest rate of 29.74% APR, notwithstanding Plaintiff's historically stellar credit profile.

209. Despite receiving multiple disputes, Defendant CBNA continues to attempt to collect on the fraudulent debt.

210. By way of example, in January 2026, Defendant CBNA initiated a collection action in Queens Civil Court, Case No. CV-100845-26-/QU, against Plaintiff, in which Defendant CBNA complains, alleges, and purports that Plaintiff owes $21,825.32 on the relevant CBNA account.

211. At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

212. At all times pertinent hereto, the conduct of Defendants, as well as that of their representative agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

213. Plaintiff's ongoing stress and anxiety over the situation, and after repeatedly

receiving one non-responsive communication after another from the Defendants, Plaintiff feels a surge of panic each time he receives another communication from the Defendants. His ongoing stress and anxiety regarding the situation have negatively affected him and his relationships.

214.     The Defendants have had years of notice in the form of federal lawsuits, despite it all, the Defendants failed to take any better steps to protect the Plaintiff here.

215.     The internal policies and procedures of the Credit Bureau Defendants do not appear to place any value on their obligations under the FCRA to report credit entries accurately, to reinvestigate carefully when notified of consumer disputes, and to avoid giving third parties access to consumers' reports without authorization or permissible purpose.

216.     As a standard practice, the Credit Bureau Defendants do not conduct independent investigations in response to consumer disputes. Instead, they merely parrot the response of the data furnishers, like Defendant CBNA here, despite numerous court decisions admonishing this practice. See *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

217.     The Defendants are aware of the shortcomings of their respective procedures and intentionally choose not to comply with the FCRA to lower their costs. Accordingly, the Defendants' violations of the FCRA are willful.

32

218. Defendants' policies and procedures clearly establish willfulness, wantonness, and utter and reckless disregard for the rights and interests of consumers and led directly to the injuries of Plaintiff as described in this complaint.

219. As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; revocation of credit; the expenditure of time and money disputing and trying to remove the inquiries which were the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove the inquiries which were the product of identity theft.

220. Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by the Defendants.

## COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to
### Assure Maximum Possible Accuracy
### (The Credit Bureau Defendants)

221. Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully set forth herein.

222. The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

223. On numerous occasions, the Credit Bureau Defendants prepared patently false

33

consumer reports concerning Plaintiff.

224.    Despite actual and implied knowledge that Plaintiff was the victim of identity theft, the Credit Bureau Defendants readily and repeatedly sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness by suggesting that Plaintiff charged and owed nearly $20,000.00 to Defendant CBNA.

225.    A third-party reviewing Plaintiff's credit reports would reasonably infer that Plaintiff was a bad credit risk.

226.    In fact, at least one creditor, American Express, did review and infer exactly that and worst yet, acted upon its fear and cut back on Plaintiff's line of credit by two thirds.

227.    Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

228.    Defendant Experian violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

229.    Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

230.    As a result of the Credit Bureau Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; revocation of credit; the expenditure of time and money disputing and trying to remove the inquiries which were the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove

34

the inquiries which were the product of identity theft.

231.    Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by the Credit Bureau Defendants.

232.    The Credit Bureau Defendants' conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, the Credit Bureau Defendants were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

233.    Plaintiff is entitled to recover attorneys' fees and costs from the Credit Bureau Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
### 15 U.S.C. § 1681i
### Failure to Perform a Reasonable Reinvestigation
### (The Credit Bureau Defendants)

234.    Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully set forth herein at length.

235.    The FCRA mandates that a CRA conduct an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. See 15 U.S.C. § 1681i(a)(1). The Act imposes a 30-day limitation for the completion of such an investigation. Id.

236.    The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the

accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file. See 15 U.S.C. § 1681i(a)(5)(A).

237.    In or around May of 2025 and again in January of 2026, Plaintiff disputed the inaccurate information with the Credit Bureau Defendants and requested that they correct and/or delete a specific item in his credit file that is patently inaccurate, misleading, and highly damaging to him, namely, the approximately $22,000.00 furnished by Defendant CBNA and allegedly owed by Plaintiff for purchases that were the product of fraud and identity theft.

238.    Plaintiff disputed the identity theft information to the Credit Bureau Defendants, to no avail.

239.    Plaintiff supported his disputes with a copy of the police report and an FTC ID Theft Affidavit.

240.    Despite actual and implied knowledge that Plaintiff was the victim of identity theft, and in response to Plaintiff's disputes, the Credit Bureau Defendants conducted virtually no investigations of Plaintiff's disputes, or such investigations were so shoddy as to allow patently false and highly damaging information to remain in Plaintiff's credit file.

241.    Plaintiff expended resources in the form of time and money to repeatedly dispute the information that was the product of fraud and identity theft with the Credit Bureau Defendants.

242.    The Credit Bureau Defendants' refusal to remove the information that was the product of fraud and identity theft lent credibility to the disputed debt and suggested to all third parties that Plaintiff did in fact owe that debt.

243.    Defendant Equifax violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day

36

period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

244.    Defendant Experian violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

245.    Defendant Trans Union violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

246.    As a result of the Credit Bureau Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; revocation of credit; the expenditure of time and money disputing and trying to remove the inquiries which were the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove the inquiries which were the product of identity theft.

247.    Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss,

37

reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by the Credit Bureau Defendants.

248.    The Credit Bureau Defendants' conduct, actions, and inactions was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, the Credit Bureau Defendants were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

249.    Plaintiff is entitled to recover attorneys' fees and costs from the Credit Bureau Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT III
### 15 U.S.C. § 1681c-2
**Failure to Block Identity Theft Information**
**(The Credit Bureau Defendants)**

250.    Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth herein at length.

251.    Plaintiff repeatedly submitted ample evidence of the fact that he was an identity theft victim. Plaintiff further supported the fact that he was an identity theft victim by providing to a Police Report and FTC ID Theft Affidavit.

252.    The Credit Bureau Defendants should have blocked the identity theft information at the outset.

253.    As a result of the Credit Bureau Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; revocation of credit; the expenditure of time and money disputing and trying to remove the inquiries which were the

38

product of identity theft; and, the expenditure of labor and effort disputing and trying to remove the inquiries which were the product of identity theft.

254.    Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by the Credit Bureau Defendants.

255.    Defendant Equifax violated 15 U.S.C. § 1681c-2 by failing to block the reporting of the disputed information which was due to identity theft from Plaintiff's file.

256.    Defendant Experian violated 15 U.S.C. § 1681c-2 by failing to block the reporting of the disputed information which was due to identity theft from Plaintiff's file.

257.    Defendant Trans Union violated 15 U.S.C. § 1681c-2 by failing to block the reporting of the disputed information which was due to identity theft from Plaintiff's file.

258.    The Credit Bureau Defendants' conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, the Credit Bureau Defendants were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

259.    Plaintiff is entitled to recover attorneys' fees and costs from the Credit Bureau Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT IV
### 15 U.S.C. § 1681s-2(b)
### Failure to Conduct an Investigation of the Disputed Information and Review of all Relevant Information Provided by the Consumer
### (Defendant CBNA Only)

260.    Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully set forth herein at length.

261.    Defendant CBNA refused to remove information that was the product of identity theft and fraud – namely, some $22,000.00 in purchases made on Plaintiff's CBNA Best Buy Credit Card Account without his permission or consent.

262.    Defendant CBNA violated 15 U.S.C. § 1681s-2(b) by failing to investigate Plaintiff's dispute(s), or otherwise by failing to fully and properly investigate Plaintiff's dispute(s), including but not limited to failing to review all relevant information regarding the same; by failing to permanently and lawfully correct its own internal records to prevent the re-reporting of the inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to the Credit Bureau Defendants; and, by failing to cease furnishing inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to the Credit Bureau Defendants.

263.    As a result of Defendant CBNA's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; revocation of credit; the expenditure of time and money disputing and trying to remove the inquiries which were the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove the inquiries which were the product of identity theft.

264.    Additionally, Plaintiff suffers interference with daily activities, as well as emotional

distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by Defendant CBNA.

265.    Defendant CBNA's conduct, actions, and inactions were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Defendant CBNA was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

266.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant CBNA in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court grant the following relief against Defendants:

1)    Declaratory judgment that Defendants violated the FCRA, 15 U.S.C. § 1681;

2)    An award of actual, statutory, and punitive damages pursuant to 15 U.S.C. §§ 1681, *et seq.;*

3)    An award of costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1681n and § 1681o; and

4)    Such other and further relief as this Honorable Court may deem just and proper, including any applicable pre-judgment and post-judgment interest, and/or declaratory relief.

## JURY DEMAND

Plaintiff hereby demands jury trial on all issues so triable.

Dated: April 7, 2026,                                      **CONSUMER JUSTICE LAW FIRM**

By:     */s/ Levi Y. Eidelman*
        Levi Y. Eidelman, NY Bar No. 5742499
        72-47 139th Street
        Flushing, New York 11367
        T: (718) 360-0763
        F: (480) 613-7733
        E: leidelman@consumerjustice.com

        *Attorneys for Plaintiff Abu Sadut Tanvir Ahmed*

42